**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:26-CR-6-ZMB-SPM |
| | ) | |
| ERIC DAVIS and TAHLIS WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION AND MEMORANDUM OPINION OF UNITED STATES MAGISTRATE JUDGE**

All pretrial matters in the above-named cause have been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Currently before this Court are Motions to Suppress Evidence and Request for a Franks Hearing filed by Defendants Eric Davis (ECF No. 51 & 64) and Tahlis Williams (ECF No. 72). The United States has filed responses opposing both motions. ECF Nos. 54, 61 & 73.

Defendants' suppression motions challenge the sufficiency of a search warrant affidavit submitted in support of a search warrant that authorized law enforcement to search storage units rented by Public Storage to Defendant Davis (Unit C 60) and Defendant Williams (Unit C 32). Defendants contend the affidavit, on its face, was based on speculation and conjecture and failed to establish probable cause that evidence of a crime would be found in the storage units. *See* ECF No. 51, at 4-5 and ECF No. 72, at 3-4. Defendants also argue that they are entitled to a *Franks* hearing because the search warrant affidavit is misleading. Specifically, defendants contend the affiant deceptively blurred the distinction between observation and speculation and included investigative conclusions as opposed to observed facts. ECF No. 51, at 7-8; ECF No. 72, at 6-7.

The United States filed a response opposing the motion arguing that (i) Davis lacks

standing to challenge the search of the storage unit owned by his co-defendant, (ii) the search of both units was lawful because the warrant affidavit established probable cause, (iii) the officers executing the warrant acted in good faith reliance on the search warrants, and (iv) the defendants are not entitled to a *Franks* Hearing because they failed to make the substantial preliminary showing required for a hearing under *Franks v. Delaware*, 438 U.S. 154, 171 (1978). ECF Nos. 54, 61 & 73. For the reasons more fully discussed below, this Court finds, and respectfully recommends, that Defendants' suppression motions be denied.

**PROCEDURAL BACKGROUND**

On January 14, 2026, a federal grand jury returned an indictment charging Defendants Davis and Williams with one count of Conspiracy to distribute and possess with intent to distribute controlled substances including 50 grams or more of methamphetamine (Count 1) and charging both defendants with one count each of possession with intent to distribute controlled substances, including 50 grams or more of methamphetamine (Counts 2 and 3). *See* ECF No. 2. Davis was arrested on February 12, 2026, and made his first appearance and was arraigned on the same date. Williams was arrested on February 20, 2026, and made his first appearance and was arraigned on the same date. Through counsel, both defendants requested, and were initially granted, time through March 30, 2026, to file or waive pretrial motions. Defendants requested, and were granted, additional time to file pretrial motions. On June 19, 2026, Davis filed the Motion to Suppress and Request for a *Franks* hearing currently pending before the Court. ECF No. 51.

On July 2 and 8, 2026, the United States filed its response to Davis's motion arguing, among other things, that no motion should be held. ECF Nos. 54 & 61. On July 8, 2026, the undersigned held a pretrial motion status hearing and heard arguments as to the government's request that no evidentiary hearing be held. The Court granted defense counsel leave to respond to

the government's request. *See* ECF No. 64. On August 21, 2026, Williams filed a suppression motion which was nearly identical to Davis's motion. ECF No. 72. On September 4, 2026, the United States filed its response opposing Williams's motion. ECF No. 73.

After considering the parties' arguments, written and oral, the court entered an order denying the request that no hearing be held and scheduled an evidentiary hearing on September 15, 2026. *See* ECF No. 65. On September 15, 2026, the parties appeared for an evidentiary hearing. At the hearing, the United States presented the testimony of Matthew Thomas, a Special Agent with the Drug Enforcement Administration and the affiant on the search warrant affidavit ("Agent Thomas"). The United States also presented a copy of the search warrant packet including the affidavit. *See* Govt. Ex. 1. Defendants did not present any additional witnesses or evidence but cross-examined Agent Thomas. At the end of the suppression hearing neither party requested a transcript or time for post-hearing briefing. As such, the motion was taken under submission.[1] This Court has carefully considered the entire evidentiary record, applicable case law, and the parties' written submissions and oral arguments and makes the following findings of fact and conclusions of law.

## I. FACTUAL FINDINGS

These factual findings are based on Agent Thomas's testimony at the evidentiary hearing, which the undersigned found to be credible, and the information contained in the search warrant affidavit.

[1] Although the motion to suppress was taken under submission at the time of the evidentiary hearing, the Court's review of the motion was delayed by approximately one week while the undersigned waited for the United States to provide an unredacted copy of the search warrant packet to defense counsel. *See* ECF No. 79.

***A. Agent Thomas's Testimony***

Agent Thomas testified that, on November 13, 2025, he met by telephone with the Honorable Patricia L. Cohen, U.S. Magistrate Judge, and swore to the contents of an affidavit submitted in support of a warrant to search two storage units at Public Storage in the City of St. Louis: Unit C 60 and Unit C 32. Before Agent Thomas presented the search warrant packet to Judge Cohen, Assistant United States Attorney Samantha Reitz ("AUSA Reitz") reviewed the packet. AUSA Reitz joined Agent Thomas when he presented the search warrant application packet to Judge Cohen. Except for the information contained in the search warrant packet, Agent Thomas did not share any information about the investigation with Judge Cohen. Following the call with Judge Cohen, Judge Cohen signed the warrant, and the investigative team executed the search warrant. Agent Thomas testified that, based on the warrant, he believed the investigative team had the legal authority to search storage Units C 60 and C 32.

***B. The Search Warrant Affidavit***

In the search warrant affidavit, Agent Thomas attested that he had been a Special Agent with the DEA since 2023. *See* Govt. Exh. 1, ¶2. He detailed his training and experience and attested that the facts in the affidavit came from his personal observations, his training and experience and information obtained from agents and witnesses. *Id.* at ¶3.

Regarding the investigation, Agent Thomas attested that in August 2025, investigators were provided information by a Confidential Source working with the St. Louis Metropolitan Police Department ("CS-1"), who identified a methamphetamine distributor using a moniker "Diamond." *Id.* at ¶6. Using information provided by CS-1, investigators were able to develop, and later confirm, the distributor's identity. *Id.* at ¶7. Agent Thomas and other DEA investigators conducted a total of four successful controlled purchases of suspected methamphetamine from the distributor, the most recent of which occurred on November 12, 2025. *Id.* at ¶8.

The affidavit asserts that before the controlled buy on November 12, 2025, investigators identified an address for the distributor's suspected paramour using a combination of toll records and information from a precision location warrant. *Id.* at ¶10-12. Through surveillance investigators confirmed that the distributor was frequently at that address. *Id.* On November 12, 2025, Agent Thomas and other investigators established surveillance near the distributor's identified address and directed CS-1 to place a recorded phone call to the distributor for the purpose of conducting a controlled purchase of methamphetamine. *Id.* at ¶¶ 13-15.

The affidavit asserts that, during the recorded call, CS-1 told the distributor "I need another one" which investigators knew from previous controlled purchases meant that CS-1 was referring to one pound of methamphetamine. *Id.* at ¶¶ 15-16. Approximately thirty minutes later, CS-1 placed a second recorded call to the distributor who advised that he was "going to have someone bring 'it' to him, because he didn't currently have 'it' in his possession." *Id.* at ¶17. Both CS-1 and investigators construed "it" to mean the methamphetamine CS-1 had previously requested. *Id.* Approximately fifteen minutes later, CS-1 placed a third recorded call to the distributor and asked if the distributor "was good to conduct the transaction" to which the distributor responded, "yeah give me fifteen minutes." *Id.* at ¶18. The distributor directed CS-1 to meet at 5588 Dr. Martin Luther King Drive in St. Louis ("the Meetup Location"). *Id.* Investigators and CS-1 understood this to mean that the distributor was directing CS-1 to the Meetup Location to purchase the methamphetamine from the distributor. *Id.*

Based on assertions in the affidavit, approximately five minutes after the distributor directed CS-1 to the Meetup Location, at 11:53 AM, investigators observed a white SUV pull up to the distributor's apartment and, approximately two minutes after that, at 11:55 AM, investigators observed the white SUV drive away with a black male occupying the back seat. *Id.* at ¶¶ 19-20. At

12:19 PM, at the direction of investigators, CS-1 placed a fourth recorded call to the distributor who indicated that he was "almost there." *Id.* at ¶21. Agent Thomas and other investigators continued their surveillance of the white SUV and saw it arrive near the Meetup Location at 1618 Semple Avenue. *Id.* at ¶22.

The affidavit further asserts that, at approximately 12:25PM investigators observed an individual get out of the back seat of the white SUV and approach the passenger window of a black SUV parked in the area. *Id.* at ¶23. Based on the investigation, investigators believed the individual who got out of the back seat of the white SUV was the distributor. *Id.* While the distributor was conversing with the occupants of the black SUV, at 12:40 PM, investigators observed a grey sedan pull up behind the black SUV and saw the distributor walk away from the passenger window of the back SUV and enter the front passenger seat of the grey sedan. *Id.* at ¶26. At approximately 12:46 PM, investigators saw the distributor get out of the front passenger seat of the grey sedan and walk back toward the black SUV. *Id.* at ¶28. The investigators continued surveillance of both the distributor, who returned to the black SUV, and the grey sedan, which left the area and made its way to I-70 East. *Id.* at ¶27-28.

Meanwhile, at approximately 12:37 PM investigators observed CS-1 arrive at the Meetup Location. *Id.* at ¶¶24-25. By that point, CS-1 was equipped with official advanced funds for the controlled purchase and a covert audio transmitting/recording device. *Id.* At approximately 12:50 PM, investigators observed the distributor walking from Semple Avenue toward the Meetup Location, arriving at CS-1's vehicle at approximately 1 PM. *Id.* at ¶¶29-30. The distributor entered the front passenger seat of CS-1's vehicle and, based on the covert recording of their discussion, investigators heard the distributor say the person he was waiting on had to "go downtown and come right back" to him and the person already had the distributor's money. *Id.* at ¶30. This

exchange led investigators to believe the person in the grey sedan was traveling elsewhere to procure the one pound of methamphetamine requested by CS-1. *Id.* at ¶31.

The affidavit avers that, at approximately 1:01 PM, investigators conducting mobile surveillance observed the grey sedan arriving at Public Storage. *Id.* at ¶32. The grey sedan eventually parked in front of Unit C 60 which investigators learned (pursuant to an administrative subpoena) was rented to Defendant Davis, with no other individuals authorized to access that unit. *Id.* at ¶32 & note 4. From approximately 1:04 PM to 1:10 PM investigators observed the driver of the grey sedan going through the contents of Unit C 60. *Id.* at ¶34. Based on their investigation, investigators believed Defendant Davis was the individual driving the grey sedan and going through the contents of Unit C 60. *Id.* Investigators saw Davis placing something retrieved from a box in the storage unit into the trunk of his sedan. *Id.* At approximately 1:10 PM, investigators observed Davis get back into the grey sedan and drive towards another storage unit, stopping alongside a silver SUV with Virginia plates that was parked in front of Unit C 32. *Id.* at ¶35. Based on information from an administrative subpoena, investigators learned Unit C 32 was rented to Defendant Williams, with no other individuals authorized to access the storage unit. *Id.*

At approximately 1:11 PM, investigators observed an individual believed to be Williams exit the silver SUV and, together with Davis, enter Unit C 32. *Id.* at ¶36. Investigators observed Davis and Williams going through the contents of storage Unit C 32. *Id.* At approximately 1:15 PM, investigators saw Davis exit storage Unit C 32, reenter the grey sedan, and drive back to Unit C 60. Once back at Unit C 60, investigators observed Davis move items around in the trunk of the sedan, open the door to Unit C 60, reach into the trunk of the sedan, and then return to the unit where he appeared to move contents around in the storage unit. *Id.* at ¶38. At approximately 1:18 PM, investigators saw Davis close the door to Unit C 60, close the trunk of the sedan, and then

drive back to the area near Unit C 32, where the individual believed to be Williams was still rummaging around in Unit C 32. *Id.* at ¶39. At approximately 1:19 PM, investigators saw Williams close the door to his storage unit, appear to place something in the passenger seat of the silver SUV, and then walk over to Davis in the grey sedan. *Id.* at ¶40. The grey sedan and the silver SUV left Public Storage around 1:21 PM, with investigators maintaining surveillance of the grey sedan driven by Davis. *Id.* at ¶41.

The affidavit asserts that while some investigators were surveilling Davis in the grey sedan, other investigators continued monitoring CS-1 and the distributor back at the Meetup Location. *Id.* at ¶42. At approximately 1:30 PM investigators saw the distributor get out of CS-1's car and into an Uber. *Id.* at ¶43. Investigators maintained surveillance of the distributor as he traveled to a business owned by Davis on Jennings Station Road in Pine Lawn, Missouri. *Id.* Investigators saw the distributor get out of the Uber at approximately 1:35 PM at the corner of Francis Street and Jennings Station Road. *Id.* at ¶44. Moments later, Davis pulled into the parking lot of his business in the grey sedan where he met with the distributor. *Id.* Specifically, investigators saw Davis apparently rummaging through the trunk of the grey sedan for about one minute while the distributor stood nearby. *Id.* at ¶45. Investigators could not see whether there was an exchange of any items between the two men because their view was obstructed by the trunk of the sedan. *Id.* However, investigators could see both individuals the entire time and neither walked into Davis's nearby business. *Id.* At approximately 1:37 PM, both men entered the sedan with Davis in the driver's seat and the distributor in the passenger seat. *Id.* at ¶46. The sedan left the parking lot of Davis's business and returned to the area of Burd Avenue. *Id.*

At approximately 1:45 PM investigators saw the grey sedan parked on Burd Avenue. *Id.* at ¶47. The distributor was standing outside of the sedan conversing with Davis who was still seated

in the grey sedan. *Id.* Moments later, investigators saw the grey sedan driven by Davis continue to drive down Burd Avenue while the distributor began walking toward the Meetup Location where CS-1 was waiting. *Id.* Investigators observed the distributor enter the passenger seat of CS-1's car around 1:47 PM and exit the car around 1:50 PM. *Id.* at ¶¶48-49. Approximately five minutes later, at 1:55 PM, investigators met with CS-1 and seized two individual bags of suspected methamphetamine, seized the covert recording device, and searched CS-1 and CS-1's car for contraband with negative results. *Id.* at ¶50. Investigators debriefed CS-1 who mentioned that he/she had jokingly referred to the distributor as a "middleman." *Id.* at ¶51. In response, the distributor denied he was a middleman and told CS-1 that he had "gone in" on $10,000 worth of methamphetamine and CS-1 should "go in" on it with him. *Id.*

Agent Thomas attested that, based on his own training and experience as well as that of the investigative team, they believed additional methamphetamine the distributor purchased as part of this $10,000 purchase was likely located within storage Unit C 60 and/or Unit C 32. *Id.* Agent Thomas also attested that, based on his training and experience and that of the investigative team, he was aware that storage units are routinely used to store bulk quantities of drugs as they afford drug traffickers more space for storage and handling while providing more effective access for the transportation vehicles. *Id.* at ¶53. Based on that same training and experience, Agent Thomas further attested that the activity observed at the storage Units C 60 and C32 was consistent with the retrieval of methamphetamine from one or both storage units and, based on the interactions observed between Davis and Williams the use of the two units is connected. *Id.* at ¶54. Agent Thomas attested to common practices by drug traffickers relative to the storage and distribution of drugs. *Id.* at ¶¶55-55(j).

## I. CONCLUSIONS OF LAW

Because Defendant's suppression motion challenges the sufficiency of the residential search warrants, this Court's analysis begins with a review of the warrants and supporting affidavit.

### A. LEGAL STANDARD FOR REVIEW OF SEARCH WARRANTS

"Issuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is fair probability evidence of a crime will be found in a particular place." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (citing *United States v. Rodriguez*, 711 F.3d 928, 936 (8th Cir. 2013)). Probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause may be found in hearsay statements from reliable persons, *Gates*, 462 U.S. at 245; or in observations made by trained law enforcement officers, *McDonald v. United States*, 335 U.S. 451, 454 (1948). While these are some of the common ways in which probable cause is established, they are not all-inclusive.

Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented. *Gates*, 462 U.S. at 230. It is well-established that, when the issuing judge relies on the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citations and quotations omitted); *see also United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014); *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995). After a judicial officer has issued a warrant upon a finding of probable cause, that finding normally deserves great deference. *Gates,* 462 U.S. at 236. Thus, "[t]he affidavit should be examined under a commonsense approach that is not in a hyper technical fashion." *Solomon,* 432 F.3d at

827 (citation and quotations omitted). *See also United States v. Ventresca,* 380 U.S. 102, 109 (1965); *Gladney,* 48 F.3d at 312 (explaining that "[a]ffidavits must be read in a common-sense and realistic fashion") (citations and quotations omitted). In applying this principle when reviewing the issuance of a warrant, this Court "afford[s] great deference to the issuing judge's probable-cause determination, ensuring only that the judge had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing." *United States v. Petruk,* 929 F.3d 952, 959 (8th Cir.) (citations and quotations omitted; emphasis supplied), *cert denied,* 589 U.S. 1065 (2019); *see also United States v. Daigle,* 947 F.3d 1076, 1081 (8th Cir. 2020) (citations and quotations omitted).

Where the search warrant affidavit is based substantially on information provided by an informant, evidence of the informant's reliability, veracity, and basis of knowledge is highly relevant to, but is not dispositive of, the probable cause determination. *Gates,* 462 U.S. at 230. The Eighth Circuit has identified several factors the court should consider in determining whether information from an informant is reliable. For example, "[a]n informant's tip can be sufficient to establish probable cause if the informant 'has a track record of supplying reliable information' or if the tip 'is corroborated by independent evidence.'" *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). The Eighth Circuit has also held that "there are indicia of reliability in 'the richness and detail of a firsthand observation.' " *United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009) (quoting *United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990); *see also Gates*, 462 U.S. at 234 (finding that an informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight"); *Williams*, 10 F.3d at 594 (noting that source's information was timely and "based on the informant's first-hand observations,

not merely from rumor or innuendo"). Furthermore, "[t]he circumstances of personal questioning may also enhance reliability and credibility." *Buchanan,* 574 F.3d at 562; *see also United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994) (stating the reliability of a tip is enhanced when a law enforcement officer meets personally with the informant to assess his credibility).

### B. The Warrant Was Supported by Probable Cause

Based upon the facts contained within the four corners of the affidavit, this Court finds the warrant, which authorized agents to search storage Units C 60 and C 32, was supported by probable cause. Specifically, Agent Thomas's search warrant affidavit established that, based on the totality of circumstances, investigators had reason to believe that Defendants Davis and Williams and perhaps others, supplied methamphetamine to the distributor who sold methamphetamine to CS-1 during the controlled purchase on November 12, 2025. The affidavit makes clear the investigation was initiated based on reliable information from a confidential informant whose information was corroborated by investigators. In addition, the affidavit describes surveillance by investigators that connected the distributor to Davis, Williams, and the two storage units during the controlled purchase by CS-1 on November 12th. The observations detailed in the warrant affidavit support the conclusion by investigators, including Agent Thomas, that based on training and experience, what the investigative team observed was consistent with Davis and Williams and the distributor using the target storage units to facilitate trafficking in controlled substances to CS-1 and others.

Defendants argue that the affidavit is insufficient, vague, and relies on speculation and conjecture. The Court acknowledges that, as defendants contend, at no point in the affidavit did investigators observe methamphetamine or other narcotics inside either storage unit. Nor does the affidavit assert that investigators observed either Davis or Williams physically in possession of suspected methamphetamine or any other narcotics. Instead, the affidavit relies on inferences drawn by Agent Thomas and other investigators based on their observations of interactions

between CS-1 and the distributor, their observations of the distributor's subsequent interactions with Davis, and their observations of Davis and Williams at Public Storage. Perhaps, under different circumstances, there might be some merit to defendants' argument that their conduct at Public Storage and interactions with the distributor, which Agent Thomas detailed in the affidavit, is innocuous and cannot rise to the level of probable cause to believe evidence of a crime could be found in their respective storage units. However, in this case, as the affidavit makes clear, defendants' innocuous-seeming conduct occurred during a recorded controlled purchase of one pound of methamphetamine by CS-1 from the distributor.

For example, the interactions between Davis and Williams and their respective storage units came on the heels of a recorded conversation between CS-1 and the distributor in which the distributor advised CS-1 that he was not in possession of the requested one pound of methamphetamine, and that another individual who already had his money would need to go downtown to get "it". After this exchange, investigators observed Davis interact with the distributor, travel downtown to Public Storage, interact with Williams, and after visiting storage units C 60 and C 32, return to the distributor who was then able to deliver suspected methamphetamine to CS-1. During this transaction, the distributor indicated that he had several more pounds of methamphetamine for sale that CS-1 could "go in on." Although Agent Thomas and the other investigators never saw either Davis or Williams physically in possession of methamphetamine or any other suspected narcotics, under the "totality of the circumstances," there was a "fair probability" that evidence of drug trafficking would be found in storage units C 60 and C 32. *See Faulker,* 826 F.3d at 1144.

For the foregoing reasons, with deference to Judge Cohen's decision to issue the warrant, this Court finds the issuing judge had "a substantial basis for concluding that a search warrant [for

defendants' storage units] would uncover evidence of wrongdoing." *Petruk,* 929 F.3d at 959.[2]

### C. The Good Faith Exception Applies

Evidence seized from storage units C 60 and C 32 would be admissible under the *Leon* good faith exception even if this Court somehow concluded that the affidavit did not establish probable cause. *United States v. Leon,* 468 U.S. 897, 922 (1984). As the Eighth Circuit recognized in *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015), there are four instances where the *Leon* good faith exception does not apply: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) when the warrant is "so facially deficient" that no

[2] In opposing Defendant Davis's motion to suppress, the United States also argued that Davis lacks standing to challenge the search of Unit C 32, rented by Williams. *See* ECF No 54, at 5. Although this Court finds it unnecessary to reach the issue of standing given Wililams's subsequent challenge to the search of Unit C 32, this Court agrees that Davis failed to prove he has standing to challenge the search of Williams's storage unit. As the United States pointed out in its opposition, "[a]n individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) (quotations and citation omitted). "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Id.* (quotation marks and citation omitted); *see also Raskas v. Illinois,* 439 U.S. 128, 133–34 (1978). The burden is therefore on the defendant to "prove a sufficiently close connection to the relevant places or objects searched" to have "standing to claim that they were searched or seized illegally." *Russell*, 847 F.3d at 618 (quotations and citation omitted); *see also United States v. Juneau*, 73 F.4th 607, 613 (8th Cir. 2023) ("The concept of Fourth Amendment standing is a 'useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search.'") (quoting *Byrd v. United States*, 548 U.S. 395, 410 (2018)). In arguing that the Court should conduct an evidentiary hearing, Davis contended there were "several critical questions" he could ask at a suppression hearing that would be relevant to the issue of whether defendant had an expectation of privacy in the location searched. *See* ECF No. 64. However, Davis either did not ask those questions at the hearing or failed to obtain answers that proved he had an expectation of privacy in Unit C 32.

police officer could reasonably presume the warrant to be valid. *Id.* The good-faith inquiry asks, "whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Escudero*, 100 F.4th 964, 968 (8th Cir. 2024) (quoting *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

In this case, there is simply no evidence of record to support a finding that either Agent Thomas or any other member of the investigative team had any reason to believe the searches of the storage units were illegal despite the issuing judge's authorization. Based on the foregoing factual findings, before Agent Thomas presented the search warrant packet to Judge Cohen, he had it reviewed by Assistant United States Attorney Samantha Reitz. Except for the information contained in the search warrant packet, Agent Thomas did not share any information about the investigation with Judge Cohen. After Judge Cohen signed and issued the warrant, Agent Thomas believed that, based on the warrant, the investigative team had the legal authority to search storage Units C 60 and C 32. In addition, the defendants have neither asserted nor offered evidence to suggest that Judge Cohen abandoned her detached and neutral role in issuing the search warrant. Although defendants have suggested that the affidavit was misleading and requested a *Franks* hearing, as discussed in greater detail below, they do not suggest that the affidavit contained false information or that Agent Thomas was dishonest or reckless in preparing the affidavit, and there is no evidence of record that would support such a suggestion.

In sum, applying *Leon* to this case, the defendants' respective motions to suppress fail even if the warrant was, as they contend, insufficiently supported by probable cause. The evidence seized from the storage units is admissible because it was objectively reasonable for the agents executing the search warrant to have relied on the magistrate judge's determination that there was probable cause to issue the warrant. *United States v. Johnson,* 848 F.3d 872, 879 (8th Cir. 2017).

### D. DEFENDANTS ARE NOT ENTITLED TO A *FRANKS* HEARING

Defendants contend they are entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks,* a criminal defendant may request a hearing to challenge a search warrant on the grounds that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination. 438 U.S. at 155-56. However, to gain such a hearing, a defendant must show both (1) that the affiant made a false statement "knowingly and intentionally" or with "reckless disregard for the truth" and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause. *See id.* at 155-56; s*ee also United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (affirming denial of *Franks* hearing notwithstanding district court's finding of several misrepresentations and omissions in the search warrant; stating, "the affidavit established probable cause even absent [the] misrepresentations and including the omitted information"). The Eighth Circuit has repeatedly recognized that "[t]he requirement of a substantial preliminary showing is not lightly met." *Id.* at 898 (quoting *United States v. Mathison,* 157 F.3d 541, 548 (8th Cir. 1998)).

Defendants' assertions and the record before this Court fall far short of the substantial preliminary showing the Eighth Circuit has held is required for a *Franks* hearing. Defendants do not assert, and there is no evidence of record to suggest that Agent Thomas knowingly and intentionally or with reckless disregard for the truth made a false statement in the affidavit. Instead, defendants contend they are entitled to a *Franks* hearing because:

> Defendant has identified material statements presented as factual support for probable cause that were, in reality, speculative interpretations unsupported by direct observation. Equally significant, the affidavit omitted critical information—including admitted surveillance gaps, investigators' inability to observe any transfer of narcotics, and the speculative nature of Defendant's identification—that materially affected the magistrate's probable cause determination.

ECF No. 62, at 2; *see also* ECF No. 72, at 5-6 (arguing Williams is entitled to a *Franks* hearing because the affidavit is "filled with assumptions instead of facts" and provided no "definitive proof to support [the] assumption"). This Court disagrees with defendants' suggestion that the affidavit failed to include surveillance gaps. Based on the factual findings, the affidavit clearly pointed out gaps in surveillance and Agent Thomas went to great lengths to carefully point out times when investigators' view was obstructed. Although the inferences drawn by Agent Thomas and other investigators are articulated in the affidavit, nothing in the affidavit suggests that Agent Thomas falsely claimed he or other investigators observed either defendant physically possess narcotics. At best, defendants' assertions constitute an attack on the ***sufficiency*** of the search warrant affidavit; but, they do not amount to the "substantial preliminary showing" required for a *Franks* hearing.

## CONCLUSION

For the foregoing reasons, defendants' motions to suppress fail because the warrant authorizing agents to search storage Units C 60 and C 32 was supported by probable cause and because, even if the warrant affidavit fell short of establishing probable cause, the good faith exception applies and precludes application of the exclusionary rule. Finally, for the reasons discussed above, the defendants have failed to make a substantial preliminary showing that they are entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Eric Davis's Motion to Suppress Evidence [ECF Nos. 51] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant Tahlis Williams's Motion to Suppress Evidence [ECF No. 72] be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this recommendation and determination. Failure to file objections timely may result in waiver of the right to appeal questions of fact. *Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir. 1990).

Trial in this case will be set before the Honorable Zachary M. Bluestone, by separate order.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated: November 6, 2026.